**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTIE DAVIS,
　　　　　　*Plaintiff-Appellant,*

v.

TEAM ELECTRIC CO.,
　　　　　　*Defendant-Appellee.*

No. 05-35877

D.C. No.
CV-01-01752-OMP/
JMS

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior Judge, Presiding

Argued and Submitted
July 12, 2007—Portland, Oregon

Filed March 28, 2008

Before: Alfred T. Goodwin, Stephen Reinhardt, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Paul B. Eaglin, Eaglin Law Office, Fairbanks, Alaska, for the appellant.

Peter R. Chamberlain and Pamela J. Stendahl, Bodyfelt Mount Stroup & Chamberlain LLP, Portland, Oregon, for the appellee.

**OPINION**

REINHARDT, Circuit Judge:

In this sexual discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., electrician Christie Davis contends that her former employer, Team Electric Company, treated her worse than the male employees at a work site that had no other women until she contacted the state civil rights agency; retaliated against her for filing a discrimination complaint with the agency; and failed to prevent her supervisors from creating and maintaining a hostile work environment. The district court granted Team Electric's motion for summary judgment on all claims. We reverse.

## I. Background

In early May 2000, Team Electric hired Christie Davis as a journeyman electrician. On October 19, 2000, Team Electric assigned her to a project at the Clackamas County High School. At the time, she was apparently the only female electrician on the site.

Lyle Loughary was Davis's project foreman for the first few weeks of the assignment. On November 7, Davis told Loughary that she was experiencing neck pain from doing ceiling work for two weeks. Loughary allegedly replied that he would allow her to work in the electrical room with Bill Burkitt, and stated that he would transfer her because Burkitt "needs a girlfriend." Davis also alleges that Loughary repeatedly referred to his wife as "astrobitch."

On November 15, Davis wrote in her journal that "[Loughary]. . . laid me out on tasks leaving info out and short on materials and sometimes tools," and that the foreman told her "repeatedly NOT to go in the trailer," where meetings and breaks were held. In her deposition, Davis said:

> I wasn't included at first on meetings they would have. Who knows what they were about because I wasn't included. I complained about it and they started including me. But they still had their little personal meetings which I didn't really care, other than I felt left out. . . . They would . . . get donuts for the guys . . . . [I heard someone say] "Well, [Loughary] said the donuts are for the guys," in reprimand to Bill Walsh offering me one . . . .

Kevin Behrens, the site's project superintendent, asserted in an affidavit that if the work discussed in a field meeting did not involve a certain employee, "that employee [was] not expected or asked to attend the meeting." Similarly, project foreman Bill Walsh stated that "[i]f Davis was not present at a meeting, it was because the meeting had nothing to do with her area of work," and that "[a]t no time was Davis excluded from a meeting simply to exclude her."

Davis did not initially receive a radio, making it difficult to communicate with co-workers because, she alleges, she was "always put in another area from everybody." Team Electric responds that there were a limited number of radios, assigned

as needed, and that she received a radio after complaining. Davis also alleges that she would sometimes fail to receive any radio response from supervisors, and that co-workers talked to her over the radio in a demeaning manner. Walsh and Behrens claim that they were not aware of demeaning talk.

Davis repeatedly expressed frustration over being assigned a disproportionate number of jobs that entailed working with Monokote, a hazardous material sprayed over metal and wood. She complained to Walsh about the physical effects of her exposure to Monokote, and he responded that she would lose her job for being paranoid. When she commented to her supervisor, Dave Davis, that it was unfair that she was assigned all the Monokote jobs, he allegedly replied, "[w]e don't mind if females are working as long as they don't complain."[1]

Team Electric asserts that Davis never had to do the jobs that were even more dangerous than the Monokote assignments, that all employees had to work in hazardous areas, and that most of the time that she worked in such areas she did so with a male co-worker. It also alleges that on one occasion, when Davis asked not to work with Monokote in a new assignment, she was assigned to a different wing of the building.

In mid-January 2001, Davis told Walsh that she wanted to pursue a long-term project, such as installing the fire alarm. Walsh replied that another employee might be the "natural choice" for the alarm because he was already pulling cable. Two days later, Loughary asked Davis if she would like a "change of pace" after doing ceiling work, and offered to move her into the kitchen area.

---

[1]These were the words Davis reported in her deposition. In her journal, Davis wrote that Dave Davis said, "the guys don't mind having a girl working with them if they don't complain."

At the end of January, Loughary allegedly reprimanded Davis several times for trying to enter the trailer, telling her not to bother Behrens with work issues because it could "make [him] mad." The next day, Walsh allegedly pulled her aside and told her that he "felt uncomfortable" around her. Davis allegedly replied that she felt uncomfortable around people that made her feel "not welcome (like I shouldn't be there)," but that she was "getting over it." Walsh then told her about potential jobs on other sites, and she replied that she was interested but would have to know where they were— Davis was limited in how far she could travel because she had to take her child to daycare in the mornings.[2] In the same conversation, Walsh allegedly said "this is a man's working world out here, you know."

In mid-March, Davis worked in areas that did not yet have Monokote installed. On March 15, Dave Davis told her that she had "missed a meeting with all of the guys." On March 22, she went into the trailer and noticed that "Burkitt was getting job info from [Behrens]," even though Loughary had told her not to go into the trailer and talk to Behrens.

On March 23, Davis told Walsh that she felt isolated and that it seemed she was assigned to a disproportionate number of hazardous jobs, particularly assignments working with Monokote. On April 18, she told Walsh that she was fatigued from "being on the lifts all the time" and that "it was hard working alone all the time."

On April 19, Behrens told Davis that if she didn't like the work she should "get out of the trade." The next day, she left a message on Behrens's voicemail telling him that she could not make it to work because she "needed to seek counseling regarding the . . . incident." She wrote in her journal that she

---

[2]At one point, the male electricians voted to start their shift at 6am. Davis was given permission to arrive at 7am so that she could take care of her children.

"*can't* talk to him because every time I try . . . he blows up at me."

On April 23, Davis mailed an Employment Discrimination Questionnaire, which the Civil Rights Division of the Oregon Bureau of Labor and Industries ("BOLI") received on April 24. On the same day she mailed the questionnaire, Davis found a sticker in her car that said "Lady Killer," and was summoned to a meeting with Walsh and Behrens. Walsh asked what her thinking was about her work responsibilities, and Davis repeated that she did not enjoy working with Monokote, and gave them an extensive list of her recent assignments involving Monokote. She also told them that it was "taxing both physically and mentally," to work on the lifts for extended periods of time without variation.

On April 27, Davis found her car with the lights on. She turned them off, but when she returned at lunchtime, her blinker was on and her battery was drained. Davis filed a police report. On the same day, Walsh assigned her to check for violations in a wing of the building. On May 4, Walsh told Davis that a female electrician from another work site could work with her, and that another female electrician would start working at the site on Monday and could also work in her area. Around this time Davis was given a more desirable work assignment.

On May 9, Davis asked Walsh whether it would be possible for her to receive a cloth vest, which was a higher quality than the net vests she had been wearing. She noted in her log that male co-workers had the cloth vests, and that she had "cheaper gloves" than the other workers. Walsh allegedly denied her request.

On May 16, Davis submitted a "Complaint of Unlawful Practice" ("first BOLI complaint"), which BOLI received on May 21. The complaint alleged "unlawful employment discrimination" by Team Electric on the basis of her gender. In

particular, she claimed that Team Electric discriminated against her by (1) assigning her "dirty and hazardous jobs to prevent others from having to do them," (2) giving her an "unbalanced workload" and promising male workers jobs that she "had to ask to be given," (3) excluding her from meetings in which other electricians were included, and (4) refusing to communicate with her over the radio, or communicating with a "tone of voice" that "implied that it was demeaning to have to communicate" with her. Davis also alleged that her supervisors did not respond adequately to her complaints, and created a work environment that was "hostile to women," and in which she was held "to a different standard" due to her gender. BOLI dismissed the complaint on July 6, 2001, citing a lack of evidence. On September 4, 2001, the Equal Employment Opportunity Commission ("EEOC") dismissed the complaint and advised Davis of her right to appeal to the district court.

Davis recorded a number of incidents of sexually-charged conversation. In one instance, for example, a co-worker said, "Lips and assholes, that's all women are good for." In another, co-workers attempted to give Davis a "sexual call name."

On May 24, Walsh proposed that Davis transfer to another site, but she declined due to the commute and work shift. She also allegedly said to Walsh that she regularly got harder assignments than other workers. On May 30, Davis asked Walsh how long it would be before she could do something else. She also asked whether she could work on the fire alarm and other low voltage projects. Walsh initially agreed, but then told her to stick with her current work.

On May 31, Davis wrote in her log, "my hand is staying sore." On June 12, she told a BOLI representative that her job assignments continued to cause her physical pain. She wrote in her log, "I believe it's from piping for 8 months . . . without having any quantity of variation. *NONE* of the guys have had

this type of workload; they have all had a wide variation of tasks."

On June 19, Davis received a Workers' Compensation Form from her doctor, listing a number of work restrictions. She allegedly submitted the form to Team Electric. On June 25, she stayed home for a phone interview with BOLI. On August 10, Walsh allegedly told her to "tell him if I 'can't do' something" because of "my right hand problem. He said he has to look out for himself and for Team."

According to Mike Trusheim, the president of Team Electric, business slowed in the summer of 2001, forcing Team Electric to downsize. The layoffs were conducted in three stages, on August 30, September 7, and September 15, 2001. Davis was terminated in the second stage. Trusheim asserts that Team Electric laid her off because "it did not have work to sustain its work force," and that its decision was "unrelated to her previous claim with BOLI."

After the termination, Davis filed a second complaint with BOLI, which it received on February 28, 2002. She alleged unlawful employment discrimination as a result of filing a civil rights complaint with BOLI and/or her use of the Worker's Compensation system. She also alleged that Team Electric subjected her to retaliation, gave her assignments exceeding the light-duty restrictions established by her doctor, and laid her off even though it retained electricians with less seniority. Davis also alleged that following her complaints her supervisors were reluctant to work with her, gave her "a work variation of short duration," and assigned her tasks that the other electricians did not want.

On December 5, 2001, Davis filed *pro se* a complaint in the District of Oregon and began her efforts to present her sex discrimination claims in the proper legal form. The magistrate judge twice denied her motions for appointment of counsel, and she appeared *pro se* for the entirety of the trial court pro-

ceedings. The magistrate judge dismissed her first complaint for failure to state a cause of action arising under federal law. On October 28, 2002, Davis filed an Amended Complaint seeking compensation under Title VII of the Civil Rights Act.[3]

On November 15, 2004, Team Electric filed a motion for summary judgment on all of Davis's claims, and Davis filed a cross-motion for summary judgment. After the magistrate judge held hearings on January 10 and April 4, 2005, she issued findings and recommendations, which the district judge adopted prior to granting Team Electric's motion and denying Davis's. Davis filed a timely notice of appeal, and filed briefs before this court *pro se* before pro bono counsel, who filed replacement briefs, was appointed.

## II.   Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834 (9th Cir. 1997). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether there are any genuine issues of material fact and whether the district court correctly applied substantive law. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). We do not weigh the evidence or determine whether the employee's allegations are true. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006).

## III.   Analysis[4]

---

[3]This complaint is identical to a second Amended Complaint filed by Davis on July 28, 2003. According to the Findings and Recommendations of the magistrate judge, this was the "operative pleading." Davis also filed a third Amended Complaint on May 5, 2004, which is identical to the fourth complaint, filed on September 10, 2004.

[4]Team Electric argues that this court should disregard four arguments raised by Davis on appeal that she allegedly did not raise before the district court. These arguments concern the trial court's characterization of

Davis's disparate treatment and retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The analysis has three steps. The employee must first establish a prima facie case of discrimination. If he does, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. Finally, if the employer satisfies this burden, the employee must show that the "reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor. *Cornwell*, 439 F.3d at 1027-28. A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry— one that is most appropriately conducted by a factfinder, upon a full record." *Chuang*, 225 F.3d at 1124 (internal quotation marks omitted). "In evaluating motions for summary judg-

---

evidence as circumstantial, Davis's exhaustion of her disparate treatment claim with respect to being fired, the trial court's making of credibility determinations, and the rule that summary judgment is disfavored in employment discrimination cases.

The exhaustion issue is irrelevant because Davis failed to present evidence that she was fired on account of her gender. The circumstantial evidence issue is irrelevant because we hold that the evidence presented was specific and substantial. The remaining arguments simply involve the application of the pertinent legal principles to the facts and issues before the court. *See generally Silveira v. Apfel*, 204 F.3d 1257, 1260 n.8 (9th Cir. 2000).

ment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

## A.   Disparate treatment

### 1.   *Prima facie case*

Davis must establish a prima facie case of disparate treatment discrimination by showing that (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang*, 225 F.3d at 1123. "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

**[1]** Team Electric does not dispute that Davis satisfied the first two elements. As to the third element, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Chuang*, 225 F.3d at 1126; *see also Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818-19 (9th Cir. 2002). We have held that assigning more, or more burdensome, work responsibilities, is an adverse employment action. *Compare Kang*, 296 F.3d at 818-19 (discriminatory overtime is adverse employment condition) *with Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (employee suffered no adverse employment action because, *inter alia*, she "was not handed different or more burdensome work responsibilities").

The magistrate judge decided to "give the benefit of the doubt to Davis" and assume that she was assigned more overhead and piping work than her male co-workers, and that these assignments caused physical pain and injury. The magistrate judge assumed, but did not decide, that this allegation was sufficient to satisfy the third and fourth elements of a prima facie case.

[2] This assumption is well supported, as Davis alleged that she was assigned more strenuous overhead work, was forced to work more with Monokote, and was given less varied work than her male co-workers. Team Electric contends that there were other more hazardous kinds of work that Davis did not have to do, that on one occasion Walsh re-assigned her when she complained about working with Monokote, and that "most of the time that Davis was working with Monokote she was working side by side with a male journeyman." It does not, however, deny that in the aggregate she was given a disproportionate amount of dangerous and strenuous work. Thus, Davis's allegations that she was assigned a disproportionate amount of hazardous work compared to her male co-workers establish a prima facie case of disparate treatment.

[3] There are other grounds for finding that Davis satisfied the third and fourth elements of a prima facie case. Davis alleges that all of her male co-workers on the site were invited to meetings from which she was excluded. Team Electric contends that she was not invited to some meetings because they did not concern her area of work, or because they were not "official" meetings. Team Electric notes, and Davis agrees, that she was included in meetings after she complained. She asserts, however, that even after she was allowed to attend meetings, she was, unlike the male employees, prohibited from entering the trailer to take breaks, or to talk with the project superintendent about work matters. Davis also alleges that she was sometimes ignored by supervisors when she would attempt to communicate with them via radio. Behrens and Walsh state in affidavits that they were unaware of any

instance where they refused to use radios to communicate with her.

**[4]** The magistrate judge disregarded these allegations of exclusion, characterizing the incidents as mere ostracism, which we have held does not constitute an adverse employment action. Davis's alleged exclusion from the trailer and from radio communications was not mere ostracism, however. We have previously characterized behavior as mere ostracism when a supervisor "stared at [the Plaintiff] in an angry way and allowed [her] co-workers to be mean to her," *Manatt v. Bank of America, NA*, 339 F.3d 792, 803 (9th Cir. 2003), and when "males in the office refused to speak to [the Plaintiff] about anything other than work." *Brooks v. City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000).

**[5]** Davis's ban from an important area of the workplace, the trailer, is more severe than these types of exclusion, particularly because there is evidence that the restriction prevented her from discussing work matters with her supervisor. Davis's ability to work was similarly hampered by the alleged fact that she was sometimes ignored by supervisors when she called in over the radio. We need not decide whether either of these actions alone would be sufficient to establish an adverse employment action because, together with the discriminatory work assignments, they materially affected the terms and conditions of Davis's employment.

The magistrate judge held that Davis's allegations that she was given an inferior quality vest and gloves, and other equipment, did not establish adverse employment actions because the supplies were only slightly inferior, or were replaced. Davis provided no evidence that the vest and gloves affected her work conditions, or that other workers were given better equipment. The magistrate judge was therefore correct in

finding that Davis did not establish a prima facie case with respect to these claims.[5]

[6] In sum, we hold that Davis established a prima facie case of disparate treatment with respect to the claims involving disproportionate amount of hazardous work, exclusion from areas of the work site, and failure to respond to her radio communications. We affirm the district court's holding that she did not establish a prima facie case with respect to the safety equipment.

## 2. Pretext

[7] The next step in the *McDonnell Douglas* framework requires the employer to give legitimate non-discriminatory reasons for the alleged disparate treatment. Team Electric does not offer any reason for the alleged exclusion of Davis from the trailer or for the alleged failure to respond to her radio communications. Thus, her disparate treatment claim with respect to these allegations survives summary judgment. Team Electric has, however, offered reasons for the allegedly unequal work assignments, asserting that work was assigned based on who was available and who needed the least amount of training. To survive summary judgment on this claim, Davis must therefore proffer evidence that Team Electric's reasons are pretextual.

---

[5]The magistrate judge likely erred when she summarily rejected Davis's termination as the basis for a prima facie case of disparate treatment, on the ground that Davis did not administratively exhaust this claim. Administrative claims are to be construed broadly in the Title VII context. *See B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002); *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994); *Brown v. Cont'l Can Co.*, 765 F.2d 810, 813 (9th Cir. 1985); *Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973). We need not reach this issue, however, because Davis presented no evidence to substantiate the claim that she was fired on account of her gender, and therefore the termination cannot be a basis for Davis's disparate treatment claim.

An employee "may offer evidence, direct or circumstantial, 'that a discriminatory reason more likely motivated the employer' to make the challenged employment decision." *Cornwell*, 439 F.3d at 1028 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256). Alternatively, an employee may offer evidence "that the employer's proffered explanation is unworthy of credence." *Id.* Employees may rely on both circumstantial and direct evidence because "[d]efendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence." *Id.* at 1029. *See also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003).

The parties disagree as to whether Davis must offer "specific" and "substantial" circumstantial evidence of pretext, or whether a lesser amount should suffice. Our circuit has not clearly resolved this issue,[6] but we need not decide it here because Davis has offered specific and substantial circumstantial evidence.

[8] Davis alleged a series of discriminatory comments made by her supervisors. In one conversation, foreman Walsh pulled her aside to tell her that he "felt uncomfortable" around her. In the same conversation, he and Davis discussed her need to drop off her child at daycare, and Walsh allegedly said "this is a man's working world out here, you know." In another incident, Davis told foreman Loughary that her work

---

[6]In *Cornwell* we relied on the Supreme Court's decision in *Costa* to conclude that "in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." *Cornwell*, 439 F.3d at 1030; *see also McGinest*, 360 F.3d at 1122 ("circumstantial and direct evidence should be treated alike"). We have also held in numerous other cases since *Costa* that a plaintiff's circumstantial evidence of pretext must be "specific" and "substantial." *See, e.g., Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005).

was causing her neck pain. Loughary allegedly responded that he would assign Burkitt to be her foreman because he "needs a girlfriend." At another point, Loughary allegedly said that food for a meeting was only "for the guys." Finally, when Davis told a supervisor, Dave Davis, that she was doing most of the work entailing exposure to Monokote, he allegedly said something to the effect of "the guys don't mind having a girl working with them if they don't complain."

The magistrate judge disregarded Walsh's comments because they were not tied to any job assignment on the Clackamas County High School site, and Walsh did not transfer Davis. Even so, a reasonable jury could conclude that Walsh's response that she was in a "man's working world" is relevant evidence of pretext. A jury could also infer pretext from Loughary's suggestion that she could do another work assignment so that she could be a foreman's "girlfriend." The magistrate judge inexplicably dismissed Loughary's statement that food was only "for the guys" as "not overtly gender-based."**7**

---

**7**Team Electric contends that Loughary and Walsh's comments are not direct evidence of pretext because they are not "clearly sexist . . . . insulting, humiliating, intimidating . . . derogatory . . . . [or] threatening in any way," and did not "unreasonably interfere with Davis's work performance." *Cf. Dominguez-Curry*, 424 F.3d at 1038. This is not an unreasonable interpretation of the comments, but it would also be reasonable for a jury to infer otherwise. On summary judgment all inferences must be drawn in favor of the moving party. *See id.* at 1038-39. If the statements are not direct evidence of pretext, they are at the least circumstantial evidence from which a jury could infer pretext. "[A] single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039.

Team Electric also argues that the "stray comments" were unrelated to any decision-making process. *See, e.g., Vasquez v. County of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003). Although there is no evidence that Walsh and Loughary were involved in Davis's firing, both submitted affidavits admitting involvement in her work assignments.

The magistrate judge also disregarded Dave Davis's comments because she found that there was no evidence that he had any input into work assignments, and his comments expressed a "generalized opinion about the mindset of male electricians." The magistrate judge clearly erred in suggesting that Dave Davis was a co-worker with no managerial power. Davis asserts, and Team Electric does not deny, that she "was put under him to work," and that Dave Davis "made [her] start picking up" her things at a certain time. The magistrate judge's findings even go on to refer to Dave Davis as "one of her supervisors." Further, in assuming that Dave Davis was referring to electricians in general rather than to Team Electric, the magistrate judge erred in failing to view the evidence in the light most favorable to the plaintiff.

**[9]** We have held that the absence of female supervisors is circumstantial evidence of pretext. *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1143 (9th Cir. 2001) (absence of female supervisors one factor establishing pretext for failure to promote). As the magistrate judge noted, the record suggests that Davis was the only female electrician at the job site until after she contacted BOLI. There is no evidence that there were ever any female supervisors. In addition, Davis's allegation that similarly situated male employees were treated more favorably is itself probative of pretext. *See Vasquez*, 349 F.3d at 641.

The magistrate judge also concluded that "[a]t least during the times [Davis] was working with a male coworker on the 'undesirable' tasks, there is no basis for inferring that those tasks were assigned to her because of her gender." The issue, however, is whether Davis was assigned hazardous tasks more frequently than the male workers, not whether she was the only employee assigned such tasks.

**[10]** We conclude that this evidence, when considered as a whole, constitutes specific and substantial circumstantial evidence that the reasons Team Electric proffered for Davis's

allegedly disproportionate hazardous work assignments were pretextual. *Cf. Bergene*, 272 F.3d at 1143.

To be sure, Team Electric did a number of helpful things for Davis, including accommodating her childcare needs by assigning her to her preferred site and allowing her to work a later shift. Team Electric responded to many of Davis's grievances, including providing her with improved safety equipment, giving her a radio, allowing her to come to meetings, transferring two female electricians to the site after she filed her BOLI questionnaire, assigning her a new supervisor when she reported that Loughary had a negative attitude toward her, and re-assigning her to a different wing of the building on one occasion, when she complained about working with Monokote.

Even if, however, we were to take Team Electric's responses to some of Davis's grievances as counterweights to Davis's proffer of specific and substantial evidence of discriminatory motive, a counterweight is not enough to eliminate the need for a fact-finder to weigh the facts on both sides. A jury could weigh Team Electric's response as mitigating facts, but the litany of complaints answered may also be taken by a reasonable jury as evidence that Davis was treated differently because she was a woman. The fact that Davis's supervisors had never before had complaints about work assignments would support this conclusion. Although "this is a close case . . . [s]uch uncertainty at the summary judgment stage must be resolved in favor of the plaintiff." *McGinest*, 360 F.3d at 1124.

[11] We therefore hold that Davis has established a genuine factual issue with regard to Team Electric's motive in assigning her a disproportionate amount of dangerous and strenuous work. Accordingly, this claim as well as her claims of unequal treatment with respect to the radio communications and her access to the trailer survive summary judgment.

*B.   Retaliation*

**[12]** Davis contends that Team Electric retaliated against her for filing an employment discrimination complaint and a workers' compensation claim, by laying her off.[8] Employers may not retaliate against employees who have "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a).

The elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

Team Electric concedes that Davis engaged in protected activity when she filed her employment discrimination claim, and it is clear that Davis suffered an adverse employment action when she was laid off. *See Brooks*, 229 F.3d at 928. The issue is therefore whether Davis has presented evidence sufficient to raise the inference that protected activity was the likely reason for the termination.[9]

---

[8]Davis argued before the magistrate judge that Team Electric retaliated against her by making her work beyond her light-duty restrictions. She does not make this argument on appeal. Davis also alleged that Team Electric retaliated against her for filing a workers' compensation claim. The magistrate judge erroneously treated this claim as a possible violation of Title VII. On appeal, Appellees also "conceded that plaintiff engaged in an activity protected by Title VII when she filed . . . her workers' compensation claim." Both the magistrate judge and Appellees are mistaken: Title VII does not encompass discrimination on the basis of disability. *See* 42 U.S.C. § 2000e-2(a). Davis did not brief an alternative cause of action and we therefore do not consider this claim.

[9]Appellant's brief mistakenly takes up the exhaustion issue with respect to the retaliation claim. There is no question that the retaliation claim is exhausted, because the second BOLI complaint explicitly alleges that Davis was fired in retaliation for filing the first BOLI complaint and the workers' compensation claim.

**[13]** Davis argues that the temporal proximity of the layoff and her civil rights claim is sufficient for defeating summary judgment. We have held that "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065. *See also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). We have held that an eighteen-month gap is too long to support a finding of causation based on timing alone. *See Villiarimo*, 281 F.3d at 1065. We have found a prima facie case of causation when termination occurred fifty-nine days after EEOC hearings, *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989), and when adverse employment actions were taken more than two months after the employee filed an administrative complaint, and more than a month and a half after the employer's investigation ended. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Davis's termination was sufficiently proximate, as she was terminated on September 7, 2001, three days after the EEOC dismissed her claim.[10] We therefore hold that Davis has satisfied the causation element of her prima facie case.

**[14]** The burden next shifts to Team Electric to articulate a nonretaliatory reason for terminating Davis. *See Bergene*, 272 F.3d at 1141. Team Electric contends that Davis was laid off, with sixteen other employees, for economic reasons. But as the company conceded at oral argument, there is no evidence in the record as to why Davis in particular was laid off. It is not enough for an employer to simply state that it decided to lay off a group of workers. To meet its burden, the employer must explain why it selected the plaintiff in particular for the layoff. To impose a lesser standard would allow an employer with only the slightest amount of guile to get away with retaliation simply by laying off a victim of discrimina-

---

[10]Team Electric does not deny that it knew about the discrimination complaint, and the magistrate judge did not find that it was unaware of the complaint.

tion at the same time it laid off other workers for legitimate reasons. Team Electric has thus failed to articulate a legitimate reason for terminating Davis.

We note that even if an economic downturn were a valid reason for the layoff of some employees, Davis asserted in her administrative complaint, and Team Electric does not deny, that the company retained other electricians who were less senior than she. We also note that Davis's supervisors considered her to be a skilled and dedicated worker, creating further questions about why she was laid off despite her seniority. Both suggest that Team Electric's preferred explanation is pretextual. This evidence is particularly significant in light of the fact that Team Electric has failed to explain why its economic concerns led to the firing of Davis in particular.

**[15]** We therefore hold that Davis has proffered sufficient evidence to raise a genuine issue of material fact concerning Team Electric's motives for laying her off. To hold otherwise would result in summary judgment solely on the basis that Team Electric laid Davis off at the same time it laid off other employees, without any explanation as to why she was included in the group.

## C. *Hostile work environment*

**[16]** Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To survive summary judgment on her claim that Team Electric failed to prevent the creation of such an environment, Davis must show a genuine factual dispute as to, (1) whether a reasonable woman would find the workplace so objectively and subjectively hostile toward women as to create an abusive working environment, and (2) whether Team Electric failed to take adequate remedial and disciplinary action. *See McGinest*, 360 F.3d at 1112. The conduct must

constitute discrimination because of sex. *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

The objective measure of an abusive working environment is set by what a reasonable woman would consider abusive. *Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir. 1991). We must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[N]o single factor is required," *id.*, and "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (internal quotation marks and citation omitted).

[17] "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not constitute a hostile or abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). A working environment is abusive if "hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile. *See Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1202 (9th Cir. 1991).

The magistrate judge did not give the proper weight to some significant facts because she improperly labeled them as tainted by paranoia.[11] For example, the magistrate judge dis-

---

[11]We have noted that "it is axiomatic that disputes about . . . credibility determinations must be resolved at trial, not on summary judgment." *McGinest*, 360 F.3d at 1113 n.5. Furthermore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

counted the fact that Davis was told not to go into the office trailer even though male employees were allowed to enter. The trial court did not even factor into its analysis foreman Walsh's comment that "this is a man's working world out here, you know," in the context of a discussion about whether Davis would be able to work on other job sites given her childcare responsibilities.

The magistrate judge did take account of a number of other relevant allegations, including that one of Davis's supervisors told her that "[w]e don't mind if females are working as long as they don't complain"; that Davis's co-workers told her that the foreman Loughary had said food he brought was only for the guys; that Loughary repeatedly referred to his wife as "astrobitch"; and that Loughary told Davis she could work for a different foreman because he needed a girlfriend.[12]

It is obvious from Davis's distraught journal entries that these incidents upset her and made it more difficult for her to work. Whether these incidents would be considered abusive by an "objective" reasonable woman is a closer question. This question "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

[18] Although the incidents fall far short of physical abuse or aggressive sexual advances, "the required showing of severity . . . of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison*, 924 F.2d at 878. Here the conduct occurred repeatedly over the course of Davis's employment, and we believe that a reasonable woman could have had a reaction similar to Davis's.

---

[12]Davis alleges that her co-workers made sexually charged and misogynistic comments, and attempted to elicit Davis's "sexual call name." She also alleges that someone at the site put a sticker in her car that said "Lady Killer." Although these incidents of hostility are very disturbing, there is no evidence that Team Electric's management knew of them.

**[19]** In close cases such as this one, where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment. *Compare Nichols*, 256 F.3d at 873 (sustained campaign of taunts by supervisor and co-workers sufficiently hostile), *and Ellison*, 924 F.2d at 880-81 (unwelcome love letters and date requests from co-worker sufficiently hostile), *with Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (isolated incidents of unspecified "sexual horseplay" over period of years not sufficiently hostile). For this reason we hold that the conduct was sufficiently hostile to overcome summary judgment on the prima facie case.

The next question is whether Team Electric may be held liable for this conduct. One basis on which an employer may be held vicariously liable for sexual harassment is that the actionable hostile environment was created by one or more supervisors with immediate authority over the plaintiff. *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2005) (citing *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999)). A reasonable jury could find Team Electric liable for the hostile environment described by Davis because its supervisors played a significant role in creating the environment, making it clear to Davis on more than one occasion that women were not welcome on the work site.

An employer may assert an affirmative defense to vicarious liability by showing that (1) it exercised reasonable care to prevent and correct promptly any sexual harassment, and (2) the employee unreasonably failed to take advantage of preventive or corrective opportunities offered by the employer, or to avoid harm otherwise. *Id.* at 1183-84 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). This defense is available, however, only if the harassment did not culminate in a "tangible employment action," which is a significant change in employment status, such as discharge or undesirable reassignment. *Id.*

**[20]** Team Electric has failed to show that it took steps to prevent sexual harassment in its workplace. There is no evidence, for example, that it had an anti-harassment policy, or that it had any other preventive measures in place, such as sexual harassment training. *Cf. Nichols*, 256 F.3d at 877. One of Team Electric's project managers stated in a deposition that "pretty much whoever has a problem goes to the project manager, and it's dealt with in that manner." Nothing in the record shows whether this is a written policy, or even whether employees are informed of the policy. Davis alleged that she was prohibited from reporting her problems to anyone but her immediate supervisors—the very supervisors who allegedly created the hostile environment.

**[21]** Team Electric's only apparent attempt to correct the harassment came after Davis contacted the BOLI, following several months of alleged mistreatment by her supervisors. There is no evidence that any of these supervisors were disciplined for their conduct or even told to behave differently, and Team Electric has not shown that Davis failed to take advantage of any preventive or corrective opportunities that it offered. In sum, Team Electric has not successfully asserted an affirmative defense to Davis's claim.

For these reasons we vacate the district court's finding of summary judgment on her hostile work environment claim.

## IV.    Conclusion

**[22]** Davis has raised genuine issues of material fact on her disparate treatment, retaliation, and hostile work environment claims. The district court's grant of summary judgment in favor of Team Electric is therefore REVERSED. The case is REMANDED for further proceedings consistent with this opinion.

REVERSED AND REMANDED.