WALLACE, Senior Circuit Judge,
dissenting in part and concurring in part:
The majority is correct in all of its holdings except its conclusion that there is a genuine dispute of material fact as to whether Bel-Aire presented sufficient evidence of a legitimate, nondiscriminatory reason for transferring and ultimately lay *802 ing off Bagley. I therefore dissent from that portion of the opinion, but concur in the rest. I also write separately to highlight the ways in which Bagley’s counsel has distorted the record in his effort to establish a genuine dispute of material fact as to pretext.
I.
The majority contends that Bel-Aire’s reasons for transferring and laying off Bagley are insufficient in light of our court’s opinion in Davis v. Team Electric Co., 520 F.3d 1080 (9th Cir.2008). In Davis, a female electrician filed a sex-discrimination complaint against her employer, Team Electric. Id. at 1087. Approximately two months later, Team Electric laid off a portion of its electricians, including Davis. Id. at 1087-88. Team Electric explained that “Davis was laid off, with sixteen other employees, for economic reasons.” Id. at 1094. Team Electric, however, presented no evidence as to why Davis in particular was selected for layoff. Id. Our court held that Team Electric, having only cited generally to “economic” reasons for the layoff, did not meet its burden of articulating a legitimate, nondiscriminatory reason because “[t]o meet its burden, the employer must explain why it selected the plaintiff in particular for the layoff.” Id.
Unlike the employer in Davis, Bel-Aire not only pointed to an economic downturn for why it laid off Bagley, but it also explained why Bagley specifically was terminated. Drew Schroder, the Operations Manager and the individual in charge of staffing, explained that the Dial project had begun to wind down in May, and the pipefitters in Bagley’s crew had completed their portion of the project. ER II 212; 39: 16-19; ER II 214; 46:10-25; 47:1-25; 48; 1-25; 49:1-2. Bagley, along with the rest of his crew of pipefitters, were working on the HVAC cooling system, a discrete area of the Dial project that had its own unique set of blueprints. ER II 214; 47: 13-25, 48:1-11. That area was finished in May. ER II 214; 46:10-11. Although a small number of pipefitters were employed after May, Schroder could not simply replace a pipefitter in a different area of the Dial project with Bagley. ER II 214; 46: 12-25, 47:1-11. The other project areas were staffed with their own crews, and each area, like the HVAC area, had its own unique set of blueprints. Id. It therefore would have been impractical for Schroder to remove a pipefitter who was already working in one area of the Dial project and replace that pipefitter with Bagley, who would have been unfamiliar with that area’s blueprints. Id.
Moreover, while the evidence of Bel-Aire’s general decline in work is not, standing alone, sufficient under Davis to establish a nondiscriminatory reason for Bagley’s transfer and layoff, it nevertheless supports Bel-Aire’s contention that it had a need to lay off Bagley due to a lack of available jobs. James Dinan, the President, Chief Executive Officer, and owner of Bel-Aire Mechanical, ER II 199-200, testified that by “early May 2008, the Dial project had begun to wind down, resulting in substantially diminished staffing requirements.” Id. Throughout May, Bel-Aire laid off 18 workers from the Dial project, 6 of whom were apprentices like Bagley. ER II 200. In fact, from May to July, Bel-Aire reduced its entire staff by 1/3, totaling almost 300 people. Id.
The timeline of events also supports Bel-Aire’s contention that Bagley had been slated for layoff even before Bagley complained. The incident with the noose occurred on May 5, 2008 and Bagley did not complain until three weeks later, on May 28, 2008. ER II 317. The testimony from Dinan and Schroder demonstrates *803 that large numbers of employees were laid off from the Dial project in May, and by the end of May the work in Bagley’s area of the Dial project was complete and everyone in his crew was either laid off or transferred. ER II 200, 214; 48: 15-17. Thus, by the time Bagley complained, the layoffs at the Dial project had already commenced in full force. By transferring Bagley to the Banner project, Bel-Aire was able to extend Bagley’s employment, even though the Banner-project was finished shortly after Bagley’s transfer. ER II 212, 304.
In sum, Davis does not, as the majority contends, force this court to conclude that Bel-Aire failed to present “evidence sufficient to permit the factfinder to conclude that it had a legitimate, nondiscriminatory reason for the adverse employment action.” Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1094 (9th Cir.2005). Bel-Aire explained specifically how its lack of available work, coupled with Bagley’s skill and the completion of his assigned area on the Dial project, resulted in Bagley being transferred and ultimately laid off.
II.
While I disagree with the majority that Bel-Aire did not provide a legitimate, nondiscriminatory reason for the ultiinate layoff, I agree that Bagley introduced sufficient evidence to create a triable issue of fact as to pretext. I -write separately, however, to highlight the manner in which plaintiffs counsel inappropriately — and misleadingly — twisted portions of the record out of context.
Bagley attempts to establish pretext by presenting evidence that the Dial project was far from complete. Bagley states that “Will Guy admitted that Bel-Aire was ‘way behind’ at the Dial project, and there was plenty of more work to be done at the Dial project in early June of 2008.A closer look at this alleged admission shows that Bagley twisted Guy’s statement out of context. In the portion of the testimony Bag-ley cites, Guy is discussing the reasons he fired Vernon McBride, the individual responsible for making the hangman’s noose. ER II 156-57. The deposition testimony is as follows:
Q. Let me ask you this: Now, did you ask Vernon McBride, hey, Vernon why did you tie this hangman’s noose? What’s up with that? Basic simple question, why did you do it?
Did you ask him why he did it?
A. No.
Q. Why?
A. Because I knew it was wasn’t going to get — he probably wasn’t going to tell me the truth. Nobody was going to tell me the truth. What I had to find ■out is were they making knots on the job? Was rope being tied? Was there a hangman’s noose involved and that was enough for me.
Q. Now, sir, as a pipefitter, do you sometimes make knots to help you do your work?
A. Yes.
Q. Now, now as foreman, aren’t you supposed to teach apprentices how to do their job? Isn’t that part of the job?
A. There’s school. We have classes. There’s a knot-tying class. Were they screwing off? Yes. Should they have been on the job making knots? No.
Q. I hear you.
A. Up there in the area they were working in, they were way behind. ■
■ Id. Placing the “way behind” language back into context, it is clear that Guy was simply discussing why he was upset with McBride’s horseplay and that McBride and ■others who were engaged in that horseplay *804 had plenty of actual work to do. ER II 156-157, 239. That is a far cry from Bag-ley’s statement that Guy testified that the entire Dial project was behind and that there was plenty of work left to do in June 2008.
Next, to strengthen his pretext argument, Bagley states that even though he was transferred, other apprentices continued to work at the Dial project through November or December 2008. Bagley states: “In fact, Bel-Aire Operations Manager Drew Schroder testified that apprentices continued to work for Bel-Aire at the Dial project until November or December of 2008.” Bagley’s statement leads our court to believe that Schroder stated that other apprentices, including pipefitters, retained their positions at the Dial project through November and December even though Bagley did not. Schroder never made such a statement. Rather, Schroder testified that only two project superintendents, Will Guy and Paul Delaware, worked through that time period. ER II 213; 42: 17-24. Furthermore, in response to counsel’s question, “How many plumbers did you have working in the fall of 2008 at the Dial job? And I’ll tell you by fall, I mean September, October and November?”, Schroder answered, “We were probably down to maybe five.” ER II 213; 44: 11-15. Again, Schroder did not state that there were apprentices who continued to work on the Dial project through November or December 2008, let alone pipefitters like Bagley.
As a review of Schroder’s testimony demonstrates, Bagley took unsupported leaps in characterizing Schroder’s testimony in an effort to bolster his pretext argument. Ultimately, despite counsel’s mis-characterization of the testimony, I believe the following facts create a genuine dispute of material fact as to pretext: (1) the temporal proximity between Bagley’s complaint and his termination; (2) Will Guy’s, one of Bel-Aire’s project superintendents, testimony that Bagley should have taken matters into his own hands and may have been complaining just “to put on a show,” ER II 154; and (3) Bagley’s testimony that Guy told him he was being transferred for his physical safety as a result of the complaint, ER II100.
III.
Because Bel-Aire presented evidence as to why it slated Bagley specifically for layoff, I dissent from that portion of the memorandum disposition that holds otherwise, and concur in the remainder.