**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                                    *Plaintiff,*

            and

CAROL CHRISTOPHER; JULIE BHEND;
CARMELA CHAMARA,
                *Plaintiffs-Intervenors-*
                        *Appellants,*

                v.

NATIONAL EDUCATION ASSOCIATION,
Alaska; NATIONAL EDUCATION
ASSOCIATION,
            *Defendants-Appellants.*

No. 04-35029

D.C. No.
CV-01-00225-JKS


EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
                *Plaintiff-Appellant,*

            and

CAROL CHRISTOPHER; JULIE BHEND;
CARMELA CHAMARA,
                *Plaintiffs-Intervenors,*

                v.

NATIONAL EDUCATION ASSOCIATION,
Alaska; NATIONAL EDUCATION
ASSOCIATION,
            *Defendants-Appellees.*

No. 04-35201

D.C. No.
CV-01-00225-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Chief Judge, Presiding

Argued and Submitted
July 11, 2005—Anchorage, Alaska

Filed September 2, 2005

Before: Alfred T. Goodwin, Melvin Brunetti, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Goodwin

## COUNSEL

Jennifer S. Goldstein, EEOC, Washington, D.C., for the plaintiff-appellant.

Kenneth R. Friedman, Friedman, Rubin & White, Bremerton, Washington, Terry A. Venneberg, Tacoma, Washington, for the plaintiffs-intervenors-appellants.

Jeremiah A. Collins, Bredhoff & Kaiser, Washington, D.C., for defendant-appellee NEA.

Leslie Longenbaugh, Simpson, Tillinghast, Sorensen & Longenbaugh, Juneau, Alaska, for defendant-appellee NEA-Alaska.

---

## OPINION

GOODWIN, Circuit Judge:

This appeal presents the question whether harassing conduct directed at female employees may violate Title VII in the absence of direct evidence that the harassing conduct or the intent that produced it was because of sex. We hold that offensive conduct that is not facially sex-specific nonetheless may violate Title VII if there is sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees.

## I. PROCEDURAL HISTORY

The Equal Employment Opportunity Commission ("EEOC") brings this action against the National Education Association-Alaska ("NEA-Alaska") and the National Education Association ("NEA" or "NEA national") for violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) ("Title VII").

Three female employees filed EEOC charges against NEA-Alaska in April 2000. The EEOC filed its action against NEA-Alaska in July 2001, alleging that the organization created a sex-based hostile work environment for all three employees and that it constructively discharged one of them. All three employees subsequently intervened in this action. On June 28, 2002, plaintiffs filed a joint motion to join the NEA national as a defendant, which the district court granted. NEA-Alaska moved for summary judgment, arguing that there were insufficient facts for a jury to infer that there existed a hostile work environment or that any alleged harassment was because of sex. NEA also separately moved for summary judgment on the ground that it was not a proper party to the action and that it was not liable for any alleged violations of Title VII, assuming that there were violations. The district court granted summary judgment to both defendants, holding that a reasonable trier of fact could not find that the alleged harassment was "because of . . . sex" within the meaning of the statute. Plaintiffs timely appeal.

## II. FACTS

NEA-Alaska is a labor union that represents teachers and other public school employees. NEA-Alaska appointed Thomas Harvey Interim Assistant Executive Director in early 1998, and he began working in its Anchorage office. In August 1999, NEA-Alaska designated him Assistant Executive Director. He currently serves as Executive Director of NEA-Alaska. Carol Christopher was an employee designated as a "UniServ director" in the Anchorage office. In that capacity she helped local affiliates with organizing and training, from 1995 until she resigned in February 2000. Julie Bhend and Carmela Chamara were members of the Anchorage office's administrative support staff at all material times. Bhend began working for NEA-Alaska in 1993 and is still employed there; Chamara was employed by NEA-Alaska from 1997 until she resigned in August 2000. Both Christopher and Chamara have testified that their resignations were

precipitated by Harvey's conduct, but only Christopher has claimed a constructive discharge.

The record reveals numerous episodes of Harvey shouting in a loud and hostile manner at female employees. The shouting was frequent, profane, and often public. The record shows little or no provocation for these episodes. Christopher described an illustrative incident:

> I had a sister who was dying in California . . . [we] were all taking turns going to take care of her, and be there just in case she died, so I asked for — I went over Labor Day weekend so I wouldn't get in trouble, so I had the legitimate days off, and then I think I took an extra day . . . and when I got back, we had a meeting at the get go, right in the morning, we had a meeting, and Tom came in and said, so how's your sister? And I said, not very good at all. And I said, do I need to bring anything to this meeting, Tom? **And he said, if you would have read your fucking e-mail, you would have known, but, no, you were out of town, so we've lost a day there.** And again I just went, my sister is dying. I was with a sister who's dying, and he's saying that to me? Like people take days off — **all the men take days off there to go fishing and hunting and that's okay. He knows my sister is dying. He knows how heavy my heart is, and he can say that?** It was — so it was so astonishing and so cruel at the same time, I just again just started crying and I left the room.

(emphasis added). Bhend and Chamara also testified to Harvey regularly "yelling" at them loudly and publicly for little or no reason.

Harvey's verbal conduct also had a hostile physical accompaniment. Christopher testified that Harvey regularly came up

behind her silently as she was working, stood over her, and watched her for no apparent reason. Bhend testified that at an evaluation meeting where Harvey accused her of taking breaks with Christopher and another employee in order to talk behind his back, Harvey "lung[ed] across the table" at her and shook his fist at her. She also testified that on another occasion when she was comforting a local union president about an unrelated matter, Harvey came up behind her, grabbed her shoulders, and yelled "get back to your office." Chamara testified that in one instance, Harvey "pump[ed] his fist in [her] direction, trying to make a point, as was his custom. Stepping toward me to make the — make the point. I stepped back. I told him that he was being physically threatening." She went so far as to call the police and file a report on one occasion, on her therapist's advice that she document physical threats. The physical manifestation of Harvey's anger was also confirmed by other witnesses, including male employees. For example, Jeff Cloutier, another UniServ director, testified to Harvey's regular invasion of Christopher's and Bhend's "personal space."

Harvey's behavior clearly intimidated female employees. For example, Bhend testified that Harvey's behavior at her evaluation meeting put her in a "state of panic," and that she "felt that [she] was in jeopardy." She also testified that after that incident, she felt "physically threatened most of the time" on the job whenever Harvey was at the workplace. Indeed, Bhend went so far as to omit submission of a number of her overtime hours because she "was too scared of Mr. Harvey to turn them in to him." Like Bhend and Christopher, Chamara also testified that the impacts of the incidents with Harvey were not isolated, but created a general atmosphere of intimidation in the workplace that was "like working with a ticking time bomb because you're sitting by and you're waiting for your turn to be next." Jeff Cloutier testified, without prompting, to the "general fear of the women at our office."

## III. DISCUSSION

## Because of Sex

The district court erred in its characterization of the boundaries of a cognizable Title VII sex-based hostile work environment claim, and summary judgment was inappropriate under the applicable law. The facts in the record, interpreted in the light most favorable to the plaintiffs, could lead a reasonable juror to conclude that Harvey's conduct, of which primarily women were the targets, was "because of . . . sex" within the meaning of the statute. 42 U.S.C. § 2000e-2(a)(1). The main factual question is whether Harvey's treatment of women differed sufficiently in quality and quantity from his treatment of men to support a claim of sex-based discrimination. Addressing that question, in this case, requires a clarification of what constitutes a legally significant difference in treatment of men and women.

### 1.   The district court order

[1] The relevant content of the behavior in question includes repeated and severe instances of shouting, "screaming,"[1] foul language, invading employees' personal space (including one instance of grabbing a female employee from behind), and threatening physical gestures, all apparently following little or no provocation. Harvey's behavior was not, on its face, sex- or gender-related. No one testified that Harvey made sexual overtures or lewd comments, that he referred to women employees in gender-specific terms, or that he imposed gender-specific requirements upon women employees. The district court thought that these omissions in the evidence were fatal to the case.

[2] However, there is no legal requirement that hostile acts be overtly sex- or gender-specific in content, whether marked

---

[1]The deposition testimony repeatedly used the word "screaming."

by language, by sex or gender stereotypes, or by sexual overtures. While sex- or gender-specific content is one way to establish discriminatory harassment, it is not the only way: "direct comparative evidence about how the alleged harasser treated members of both sexes" is always an available evidentiary route. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998). The ultimate question in either event is whether " 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993)).

**[3]** The Supreme Court has held that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.* Moreover, plaintiffs do not need to prove that Harvey had a specific intent to discriminate against women or to target them "as women," as the district court put it, whether sexually or otherwise. "Title VII is not a fault-based tort scheme. Title VII is aimed at the consequences or effects of an employment practice and not at the . . . motivation of co-workers or employers." *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) (internal quotations omitted). There we held that conduct may be "unlawful sexual harassment even when harassers do not realize that their conduct creates a hostile working environment." *Id.*

The district court erred in holding that the "because of . . . sex" element of the action requires that the behavior be either "of a sexual nature" or motivated by "sexual animus." The district court recognized that plaintiffs "presented substantial evidence that Harvey is rude, overbearing, obnoxious, loud, vulgar, and generally unpleasant" but nonetheless held that because "there is no evidence that any of the exchanges between Harvey and Plaintiffs were motivated by lust" or by "sexual animus toward women as women," his conduct was not discriminatory.

**[4]** In applying this sexual animus test, the district court seemed to find it significant that Harvey did not seek "to drive

[women] out of the organization so that their positions could be filled by men." He noted that the workplace was a teacher's union, in which women were traditionally not a minority. However, a pattern of abuse in the workplace directed at women, whether or not it is motivated by "lust" or by a desire to drive women out of the organization, can violate Title VII. Indeed, this case illustrates an alternative motivational theory in which an abusive bully takes advantage of a traditionally female workplace because he is more comfortable when bullying women than when bullying men. There is no logical reason why such a motive is any less because of sex than a motive involving sexual frustration, desire, or simply a motive to exclude or expel women from the workplace.

## 2. Applying the differential effects standard

**[5]** Whatever the motive, the ultimate question under *Oncale* is whether Harvey's behavior affected women more adversely than it affected men. Plaintiffs allege that Harvey's treatment of women employees was "more abusive" and that he treated "his female subordinates worse" by "subjecting the women to more severe, more frequent, more physically threatening abuse." Defendants deny this allegation. These charges and their denials make a triable question of fact.

### a. Qualitative comparison of treatment

**[6]** We have previously held that it is error to conclude that harassing conduct is not because of sex merely because the abuser "consistently abused men and women alike." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). In that case, the sex- or gender-specific character of the abuse directed at female employees was fairly obvious, and summary judgment was clearly inappropriate. *Id.* ("The numerous depositions of Showboat employees reveal that Trenkle was indeed abusive to men, but that his abuse of women was different. It relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct."). We went on

to state that *even if* the supervisor had "used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby 'cure' his conduct toward women. *Ellison* unequivocally directs us to consider what is offensive and hostile to a reasonable *woman*." *Id.* at 1464.

**[7]** We acknowledge that our invocation of the "reasonable woman" standard, which renders sex-specific differences in the subjective effects of objectively identical behavior sufficient to ground a claim of discrimination, was rooted in the context of explicitly sex- or gender-specific conduct or speech. We now hold that evidence of differences in subjective effects (along with, of course, evidence of differences in objective quality and quantity) is relevant to determining whether or not men and women were treated differently, even where the conduct is not facially sex- or gender-specific.

**[8]** The record reveals at least a debatable question as to the objective differences in treatment of male and female employees, and strongly suggests that differences in subjective effects were very different for men and women. One male UniServ Director (the same position held by Christopher), apparently had a very different experience with Harvey than Christopher did. Mark Jones stated that Harvey raised his voice to him only on a "couple of occasions" and that they were "able to talk it out — I mean the period of raising the voice was very short" and that "[s]ince then I have not experienced any of that." Moreover, Christopher also testified that the character of Harvey's aggressiveness with male employees was different from that experienced by female employees: it had the quality of "bantering back and forth with somebody, and being with the boys . . . at the end of the day, I would go in and he and Bob and Rich and Jeff are all laughing in Tom's office, talking, talking, talking, laughing, laughing." Similarly, Bhend stated that Harvey "shar[ed] a 'we're all guys here' relationship with male employees."

However, Cloutier testified to an incident with Harvey that "scared the hell out of" him, during which, at one point, Har-

vey "instantly [ ] was three inches from my nose — chin, he's a fairly short guy . . . And I don't even remember what he was saying — very loud, spitting in my face, accusing me of being insubordinate." This is the only incident described in the record that seems to be comparable in magnitude with the multiple incidents involving female employees described by the plaintiffs. Moreover, there is no evidence in the record that any male employee manifested anywhere near the same severity of reactions (e.g., crying, feeling panicked and physically threatened, avoiding contact with Harvey, avoiding submitting overtime hours for fear of angering Harvey, calling the police, and ultimately resigning) to Harvey's conduct as many of the female employees have reported. A few instances of hostile behavior toward male employees — which the record suggests may have had a qualitatively different, "bantering" character — do not erase the possibility that a reasonable jury might find that the pattern of abuse directed at female employees was discriminatory.

### b. Quantitative comparison of treatment

The defendants argue that because Harvey had more regular contact with female than with male employees the differential effect on women was merely incidental. For example, Cloutier testified that the "men working in that office left lots of times to go to school buildings, to fly out of state. It was only the women that stayed there, and it was the women who felt most vulnerable."

[9] At least two other circuits have held, as we now do, that an unbalanced distribution of men and women in relevant employment positions, and the fact that some men were also harassed, does not automatically defeat a showing of differential treatment. *See Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir. 1993) ("[T]he incidents of abuse Kopp has cited in the record involve primarily women. . . . [A]pproximately ten involved female employees; only four involved male employees."); *Haugerud v. Amery School*

*Dist.*, 259 F.3d 678, 695 (7th Cir. 2001) (reversing summary judgment on hostile work environment claim despite fact that "[d]etermining whether plaintiff was treated differently because of her sex, as opposed to some other reason . . . is admittedly complicated by the fact that she is the only day custodian at the high school"). To hold otherwise would allow the accident of a mostly female workplace to insulate even a culpable employer from liability. The precise determination of how much qualitative and quantitative difference in treatment is enough circumstantial evidence to support a Title VII claim is a question for the jury. We leave open the possibility that in some cases, the quantitative comparison between male and female employees as classes will reveal differences too slight to survive summary judgment. In this case, however, summary judgment was not appropriate.

**Sufficiently Severe**

The facts already recited present a triable issue whether the work environment Harvey created was sufficiently severe to be illegal under Title VII. The rule is that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d at 878. Where the conduct in question was allegedly a "daily thing," there can be little question that a reasonable juror might infer that Harvey's pattern of verbal and physical intimidation, as confirmed by a wide range of employees, was sufficiently severe to satisfy the statute.

**Summary Judgment for the NEA**

NEA national argues that its summary judgment should be affirmed, even if judgment for NEA-Alaska is reversed. NEA argues that it is not a proper party in this action because it was not named in the original EEOC charges. However, failure to name the party in the original charges is not dispositive. The law of this circuit is that

> Title VII charges can be brought against persons not named in an E.E.O.C. complaint as long as they were involved in the acts giving rise to the E.E.O.C. claims. Further, where the EEOC or defendants themselves "should have anticipated" that the claimant would name those defendants in a Title VII suit, the court has jurisdiction over those defendants even though they were not named in the EEOC charge.

*Sosa v. Hiraoka*, 920 F.2d 1451, 1458-59 (9th Cir. 1990) (citation and internal quotation marks omitted); *see also Ortez v. Washington County*, 88 F.3d 804, 808 (9th Cir. 1996). Moreover, in general, "[t]he jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation." *Sosa v. Hiraoka*, 920 F.2d at 1456. NEA further argues that it "cannot in any event be held responsible under Title VII for the alleged harassment" because it did not exercise sufficient authority and control over Harvey's conduct or the conditions of his employment.

These are fact-intensive questions that have not been addressed by the district court and as to which the record has not been fully developed. Accordingly, both the jursidictional and the liability questions regarding the NEA should be addressed on remand.

## IV. CONCLUSION

**[10]** We reverse the summary judgment. There was sufficient evidence for a rational trier of fact to conclude that the alleged harassment by Harvey was both because of sex and sufficiently severe to support a hostile work environment claim under Title VII.

REVERSED AND REMANDED.