**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDREW MATTIODA, | No. 22-15889 |
| *Plaintiff-Appellant*, | D.C. No. 5:20-cv-03662-SVK |
| v. | |
| CLARENCE WILLIAM NELSON II; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Susan G. Van Keulen, Magistrate Judge, Presiding

Argued and Submitted September 13, 2023
San Francisco, California

Filed April 22, 2024

Before: J. Clifford Wallace, Danny J. Boggs,[*] and Danielle J. Forrest, Circuit Judges.

Opinion by Judge Forrest

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY**

### Employment Law

The panel reversed the district court's dismissal of Dr. Andrew Mattioda's hostile-work-environment claim, affirmed the district court's summary judgment in favor of his employer the National Aeronautics and Space Administration ("NASA") on his disability-discrimination claim, and remanded for further proceedings.

Dr. Mattioda, a scientist with NASA, has physical disabilities related to his hips and spine that he alleged required him to purchase premium-class airlines tickets for flights over an hour long. He sued NASA under the Rehabilitation Act of 1973, alleging that he suffered a hostile work environment after informing his supervisors of his disabilities and requesting upgraded airline tickets for work travel, and alleging he was discriminated against due to his disability by being passed over for a promotion.

Addressing the hostile-work-environment claim, the panel held that a disability-based harassment claim is available under the Americans with Disabilities Act of 1990 and the Rehabilitation Act. Turning to the merits of Dr. Mattioda's claim, the panel held that the district court correctly applied the *Iqbal/Twombly* standard in assessing his complaint. The district court erred, however, in concluding that Dr. Mattioda failed to allege a plausible causal nexus between the claimed harassment and his disabilities. The panel also rejected NASA's argument that

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dr. Mattioda's hostile-work environment claim failed on the alternative ground that he did not allege sufficiently severe or pervasive harassment. The panel concluded that Dr. Mattioda alleged sufficiently severe or pervasive harassment to survive NASA's motion to dismiss, and plausibly alleged a hostile-work environment claim based on his disability.

Addressing the disability-discrimination claim, the panel held that the district court correctly applied the *McDonnell Douglas* burden-shifting framework in assessing Dr. Mattioda's claim. Even assuming that Dr. Mattioda established a prima facie case of disability discrimination, NASA proffered a legitimate nondiscriminatory reason for not selecting Dr. Mattioda for an available senior scientist position. Accordingly, the district court did not err in granting summary judgment to NASA on this claim.

## COUNSEL

Erika A. Heath (argued), Duckworth & Peters LLP, San Francisco, California; Richard D. Schramm, Berliner Cohen LLP, San Jose, California; for Plaintiff-Appellant.

Adrienne Zack (argued), Assistant United States Attorney; Michelle Lo, Chief, Civil Division; Stephanie M. Hinds, United States Attorney; United States Department of Justice, Office of the United States Attorney, San Francisco, California; James A. Scharf, Assistant United States Attorney, United States Department of Justice, Office of the United States Attorney, San Jose, California; for Defendants-Appellees.

## OPINION

FORREST, Circuit Judge:

Dr. Andrew Mattioda, a scientist with the National Aeronautics and Space Administration (NASA), has physical disabilities related to his hips and spine that he alleges require him to purchase premium-class airlines tickets for flights over an hour long. He sued NASA and its Administrator (collectively referred to as NASA) under the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 *et seq.*, alleging, among other things, that he suffered a hostile work environment after informing his supervisors of his disabilities and requesting upgraded airline tickets for work travel as a reasonable accommodation and that he was discriminated against due to his disability by being passed over for a promotion. The district court dismissed Dr. Mattioda's hostile-work-environment claim for failure to state a claim and granted summary judgment for NASA on Dr. Mattioda's disability-discrimination claim based on the denied promotion.

Dr. Mattioda appeals from both orders, and we affirm in part, reverse in part, and remand for further proceedings. We agree that the district court erred in dismissing Dr. Mattioda's hostile-work-environment claim and hold, consistent with our sister circuits, that this claim may be asserted under the Rehabilitation Act. However, we affirm the district court's order granting summary judgment for NASA on the disability-discrimination claim.

## I.   BACKGROUND

Because much of the background is relevant to the district court's Federal Rule of Civil Procedure 12(b)(6)

dismissal, we primarily refer to Dr. Mattioda's allegations in his operative complaint. *See Wilson v. Craver*, 994 F.3d 1085, 1089–90 (9th Cir. 2021) ("The [c]ourt is obliged to accept all factual allegations in the complaint as true and construe them" favorably to the plaintiff. (alterations adopted) (citation omitted)). To the extent we rely on evidence presented at summary judgment, we view such evidence in the light most favorable to Dr. Mattioda. *Alexander v. Nguyen*, 78 F.4th 1140, 1144 (9th Cir. 2023).

### A. Dr. Mattioda's Employment at NASA

Dr. Mattioda began working for NASA in 2000. He suffers from, among other things, a degenerative defect in his hips and Scheurermann's disease of the spine, which causes uneven vertebrae growth and scoliosis. Since 2007, his orthopedist has written reasonable-accommodation letters stating that Dr. Mattioda must fly in premium class for flights longer than an hour because he needs to avoid prolonged sitting and be able to change positions frequently and stretch due to physical disabilities affecting his hips and spine. By 2011, after multiple surgeries, Dr. Mattioda had informed the NASA Ames Research Center, where he worked, about all his disabilities and orthopedic limitations.

Thereafter, from 2011 to 2018, Dr. Mattioda's experience at NASA was plagued by: (a) derogatory comments from his supervisors; (b) supervisors who inhibited his work opportunities; (c) unwarranted negative job reviews; and (d) resistance to his accommodation requests. In 2011, Dr. Mattioda approached his supervisor, Dr. Timothy Lee, about an upcoming work trip and advised Dr. Lee of his physical disabilities and premium-class travel request. After Dr. Lee learned of the cost for the requested travel upgrade, he "openly discussed" Dr. Mattioda's

disabilities in front of others, "compared [his] disabilities to Dr. Lee's own hip issues," and asked why Dr. Mattioda could not "just tough it out or suck it up and travel coach."

This incident was the first in a "series of harassing comments and events." For example, Dr. Lee told Dr. Mattioda that he believed another scientist was "doing all the work for" Dr. Mattioda and that he did not "respect [Dr. Mattioda] or [his] work." And during a meeting with colleagues, Dr. Lee criticized Dr. Mattioda's work to the point that one of the meeting attendees told Dr. Mattioda after the meeting that he felt Dr. Lee was acting "aggravated or angry at" Dr. Mattioda. In another meeting years later, Dr. Mattioda suggested that he could oversee a colleague's work, and Dr. Lee nearly shouted at him. Additionally, at a NASA holiday party, Dr. Lee told Dr. Mattioda "not to get his 'hopes up'" for a promotion for which Dr. Mattioda's name had been submitted.

Dr. Lee also made comments about Dr. Mattioda to other NASA employees. On one occasion, Dr. Mattioda's coworker "insisted on photographing" Dr. Mattioda giving a presentation because Dr. Lee had stated that he did not believe Dr. Mattioda was involved with the project. This same coworker told Dr. Mattioda that Dr. Lee had expressed that he did not respect Dr. Mattioda's work, thought Dr. Mattioda was lazy, and thought Dr. Mattioda was "using his medical and disability issues to avoid work." Other colleagues told Dr. Mattioda that Dr. Lee disparaged Dr. Mattioda so often that they considered such comments "background noise."

In addition to openly criticizing Dr. Mattioda, Dr. Lee inhibited Dr. Mattioda's work opportunities. For instance, he declined to support Dr. Mattioda's nomination for a

promotion but supported other candidates. He failed to authorize a spot for Dr. Mattioda's Postdoctoral Program candidate, who would have supported Dr. Mattioda's work. He lied to Dr. Mattioda by stating that Dr. Mattioda could not virtually present at a conference to which he was unable to travel. And he declined to involve Dr. Mattioda in projects and required Dr. Mattioda to submit an itemized travel request for a project that Dr. Lee did not require from another colleague.

Dr. Mattioda alleges that he also had problems with another supervisor, Dr. Jessie Dotson. Dr. Mattioda requested a travel upgrade as an accommodation from Dr. Dotson in 2011. Dr. Dotson improperly told Dr. Mattioda that he would have to use his own grant money to pay for the upgrade.[1] Dr. Dotson also warned Dr. Mattioda that he could "lose [his] job" if he kept requesting travel accommodations. She was also resistant to other accommodation requests from Dr. Mattioda, telling him she could not "find any magic pots of" money and requiring him to go through steps not required of others to receive his requests.

Dr. Dotson also mishandled her performance reviews of Dr. Mattioda. In a May 2013 performance review, Dr. Mattioda expressed concern that his disability-related inability to travel would impact his career. Dr. Dotson told Dr. Mattioda "not to worry" but then lowered one of Dr. Mattioda's ratings, which affected his yearly bonuses, for this reason. During another review, Dr. Dotson showed Dr. Mattioda an unexplained list of "proposal success rates,"

---

[1] Dr. Mattioda also alleged that Dr. Dotson and other NASA officials were resistant to his travel-related accommodation and other funding requests on other occasions.

and informed Dr. Mattioda that he was the lowest on the list. At another review, Dr. Dotson questioned whether Dr. Mattioda was "still committed to being a high-profile scientist at NASA," criticized him for not traveling, and lowered his performance rating for not submitting a particular proposal that she had previously counseled him was the "right thing to do." Thereafter, Dr. Dotson acknowledged Dr. Mattioda's failure to submit the proposal should have had no impact on his performance rating, but she denied Dr. Mattioda's request to reconsider his performance rating and also required Dr. Mattioda to sign her rejection letter.

Dr. Mattioda's other harassment-based allegations include that his supervisors disclosed his disabilities and Equal Employment Opportunity (EEO) activity to other employees, and otherwise inhibited his opportunities at NASA. And that in June 2016, NASA transferred Dr. Mattioda to a different division "[t]o help calm the waters and to provide [Dr. Mattioda] with a safe space."

## B. Denied Promotion

In November 2016, a senior scientist position became available at NASA (ST Position). Dr. Lee and other NASA employees emailed about the position, and a human resources (HR) manager emailed Dr. Eugene Tu, a Center Director at NASA, asking for approval to appoint Dr. Scott Sandford directly. Dr. Tu also supported Dr. Sandford's appointment, but he wanted "to have a brief discussion on all the upcoming ST positions (including this one) and which ones we are expecting to compete or fill directly" and expressed that he thought they "need[ed] to take a look at the diversity of our ST positions."

Dr. Tu then sent out a letter explaining that the open position would follow NASA's "procedural framework for merit staffing of ST positions," which includes convening a panel "of three or more senior leaders . . . to assist in the selection process." The designated selection panel consisted of Dr. Steven Zornetzer, as chair, and Drs. Max Bernstein, Steve Howell, and Lee, as voting members. An equal opportunity (EO) officer and an HR manager served as non-voting member and staff, respectively, on the panel. Dr. Mark Fonda ultimately replaced Dr. Howell. And Dr. Lee recused himself a week after initially agreeing to serve, and he was replaced by Dr. Jaya Bajpayee.

The ST Position posting stated that candidates would be evaluated according to criteria assessing: (1) education level and training; (2) technical excellence and contributions including experience, technical problem solving, and publications and "[i]nformation [t]ransfer"; (3) awards and recognition; (4) outside professional activities; and (5) corporate cooperation and technical leadership skills, including "coaching/mentoring and diversity and inclusion." The posting also mentioned that candidates should possess experience related to supporting "space science missions." The evaluation criteria warned "[u]ndue emphasis should not be accorded to the mere number of publications."

There were seven applicants, and the selection panel ultimately narrowed their consideration to Drs. Mattioda, Sandford, and Farid Salama. Dr. Mattioda's application indicated that he qualified for Schedule A hiring consideration, which is an affirmative-action schedule for federal employees with disabilities. *See* U.S. Off. of Pers. Mgmt., Disability Employment, Hiring, *available at* https://www.opm.gov/policy-data-oversight/disability-employment/hiring/ (stating that "[i]n the *non-competitive*

hiring process, agencies use a special authority (Schedule A) to hire persons with disabilities without requiring them to compete for the job. In the *competitive* process, applicants compete with each other through a structured process.") However, Dr. Mattioda does not appear to dispute that his Schedule A hiring eligibility was not transmitted to NASA's internal system nor that the ST Position was subject to the typical competitive process. Of the panel members, Drs. Fonda and Bernstein were aware of Dr. Mattioda's disability status and prior EEO activity during the selection process.

In their applications for the ST Position, Drs. Salama and Sandford self-reported their "h-index" values, a score which measures the impact of a scientist's published research articles. Dr. Salama reported an h-index of 34, and Dr. Sandford reported an h-index of 67 and that he had "published 207 papers." In his application, Dr. Mattioda stated that he had 33 publications in peer-reviewed journals, but he did not disclose his h-index. Dr. Mattioda also pointed out in his written responses to the evaluation criteria that "due to the lack of sufficient travel funding for scientists with disabilities at NASA . . . I have been unable to participate more fully in . . . professional activities." Before Dr. Lee recused himself from the selection panel, he emailed Dr. Zornetzer information containing each candidate's h-index, with Dr. Sandford having the highest score.

The panel did not interview the candidates, but all panel members individually rated them according to the evaluation criteria included in the job posting, and each rated Dr. Sandford the highest. Although Dr. Bajpayee gave Drs. Mattioda and Sandford the same overall rating, Dr. Bajpayee rated Dr. Sandford higher on the "awards and recognition" criteria and stated that he thought

Dr. Sandford's application was the "most articulate." Dr. Bernstein noted that Dr. Mattioda's publications were low and that he did not have impressive mission experience. In contrast, he thought that Dr. Sandford's publications are "really changing paradigms" and that Sandford's mission-involvement experience was "far beyond the other[s'.]"[2] The other panel members made similar observations on their rating sheets.

After the panel members individually rated the candidates, they met to discuss their ratings and unanimously decided to recommend Dr. Sandford for the ST Position. Dr. Zornetzer sent Dr. Tu the panel's recommendation emphasizing Dr. Sandford's "strong professional contributions to major deep space missions" and his "positive impact and robust recognition by his peers," among other qualifications.

Dr. Tu reviewed Dr. Zornetzer's memorandum and each candidate's application materials. Dr. Tu agreed with the panel's recommendation to select Dr. Sandford because he thought Dr. Sandford had a strong publication record, mission experience, and engagement with professional societies, and Dr. Mattioda and the other candidate did not have "backgrounds as strong as Dr. Sandford" in these areas. After receiving the selection panel's recommendation, Dr. Tu sent a memorandum to NASA's Acting Administrator indicating he wanted to select Dr. Sandford, and the Acting Administrator concurred in his decision.

---

[2] Dr. Bernstein sent an email indicating that his overall rating was "not merely the average of all of the scores" as that would make it "harder to see the very real differences between the candidates in the technical area[.]"

Dr. Zornetzer later told Dr. Mattioda that he was considered for the ST Position but not selected mainly because of his lower h-index score and lack of "'deep space' mission experience," neither of which was listed as a requisite qualification in the job position announcement. In the same conversation, Dr. Zornetzer informed Dr. Mattioda that he had no knowledge about the h-index and thought it was a "astrophysics thing."

Dr. Mattioda filed an EEO complaint alleging that he was not selected because of his disabilities and prior EEO activity.[3] Dr. Mattioda did not know who was on the selection panel when he filed his EEO complaint and speculated that Drs. Michael Bicay, Dotson, and Lee were involved. Dr. Mattioda criticized the panel's reliance on the h-index. As Dr. Mattioda points out, the record is inconsistent as to the source of the candidates' h-indices considered by the selection panel.[4] He also contends that the panel had differing understandings of this metric and that the panel give it undue weight. According to Dr. Mattioda, a better index would have been the "M index," which accounts for the time from a person's first publication in the field, giving more weight to a shorter publication history with the same productivity. Dr. Mattioda further attacked the panel's reliance on "deep space" mission experience because this

---

[3] Dr. Mattioda had filed three prior EEO complaints alleging he was discriminated against in prior incidents because he is Native American and because he is disabled.

[4] Dr. Fonda attested that Dr. Zornetzer provided the h-index information for each candidate. Dr. Zornetzer attested that Dr. Bernstein provided the h-index for each candidate. Drs. Bernstein and Bajpayee attested that the candidates' h-indices were in the application packets.

was not listed in the job posting and panel members also did not have a uniform understanding of this criteria.

Additionally, Dr. Mattioda asserted that panel members were biased. He claimed that Dr. Bernstein had a conflict of interest because Dr. Sandford mentored him for years. Dr. Mattioda also claimed that most of the panel members were aware of his disabilities or EEO activity, and that the panel should have considered his disabilities to account for why he had less experience.

Despite Dr. Mattioda's various challenges, he acknowledged that Dr. Sandford has significantly more experience and publications, noting that because Dr. Sandford entered the field early on, his publications were the first in the novel field. In Dr. Mattioda's view, the panel was "determined to pick the candidate with the most years of experience," which was Dr. Sandford.

## C. NASA's Motion to Dismiss

Dr. Mattioda filed four actions in 2020 (following his separate EEO complaints), which the district court consolidated. In his complaint in the consolidated action, he alleged various claims under the Rehabilitation Act, including hostile work environment, harassment, and discrimination. NASA moved to dismiss the consolidated action, and the district court granted NASA's motion in part. In doing so, the court explained that discrimination claims based on discrete adverse actions are analyzed separately for purposes of exhaustion of administrative remedies and timeliness. The district court concluded that Dr. Mattioda could not state a discrimination claim based on events occurring before July 7, 2015 (45 days before Dr. Mattioda contacted an EEO counselor) or after August 8, 2017 (the final date of allegations in Dr. Mattioda's EEO actions), to

the extent the conduct was not sufficiently similar to the allegations made in the EEO complaints, but that those incidents could be used as background to support Dr. Mattioda's exhausted and timely claims.[5] As for Dr. Mattioda's timely claim of discrimination, the district court concluded that Dr. Mattioda had stated a prima facie case under the Rehabilitation Act.

The district court indicated that hostile-work-environment claims are different from discrimination claims because they "involve[] repeated conduct," and are timely "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." The district court acknowledged that this court had not yet decided whether a harassment claim is cognizable under the Rehabilitation Act but assumed that it was. Concluding that Dr. Mattioda's allegations did not contain a "readily apparent link to [his] disability" or establish that he suffered severe or pervasive harassment, the district court dismissed Dr. Mattioda's harassment claim with leave to amend.

Dr. Mattioda then filed his operative complaint, which NASA again moved to dismiss. In its order on this motion, the district court reiterated that Dr. Mattioda had plausibly alleged a discrimination claim based on his disability. But the district court granted NASA's motion in part, without leave to amend, concluding that Dr. Mattioda still failed to link the alleged harassment that he endured to his disability.

---

[5] Dr. Mattioda does not challenge the court's exhaustion or timeliness holdings.

### D. NASA's Motion for Summary Judgment

NASA subsequently moved for summary judgment on Dr. Mattioda's surviving claims, which the district court granted in relevant part. Applying the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to Dr. Mattioda's discrimination claim based on his non-selection for the ST Position, the district court first held that Dr. Mattioda failed to establish a prima facie case of disability-based discrimination because his "wide-ranging complaints about the selection of [Dr.] Sandford over him for the ST position focus on process issues." The district court rejected Dr. Mattioda's cat's-paw theory—that Dr. Lee had discriminatory animus and influenced the selection panel's decision—reasoning that, even if Dr. Lee had such bias, there was no evidence that Dr. Lee improperly influenced the panel. The district court further explained that Dr. Mattioda had not demonstrated that Dr. Lee provided inaccurate information regarding the candidates' h-indices. And the district court emphasized that Dr. Mattioda admitted that he was less experienced than Dr. Sandford in several areas the panel considered, and that all panel members, even the one who Dr. Mattioda described as "obviously neutral," rated Dr. Sandford the highest.

Even if Dr. Mattioda had established a prima-facie case, the district court further concluded that NASA established a non-discriminatory justification for its hiring decision: that Dr. Sandford was a superior candidate. And the court also held that Dr. Mattioda failed to present any evidence that NASA's justification was pretext by showing, for example, that he was the superior candidate.

After the district court's rulings, the parties settled Dr. Mattioda's remaining discrimination claim based on his negative performance reviews, which was scheduled for trial, and the district court dismissed that claim with prejudice and entered judgment in May 2022.

## II.  DISCUSSION

### A.  Hostile-Work-Environment Claim

We review the district court's dismissal of Dr. Mattioda's hostile-work-environment claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6) de novo. *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1240 (9th Cir. 2023). "We accept as true all well-pleaded allegations of material fact in the operative complaint and construe them in favor of [Dr. Mattioda], the non-moving party." *Id.*

### 1.

As an initial matter, while this court has held that "[t]here is no significant difference in analysis of the rights and obligations created by the [Americans with Disabilities Act of 1990 (ADA)] and [the Rehabilitation Act]," *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999), we have not yet decided whether a hostile-work-environment claim is cognizable under either statute. *See McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 916 (9th Cir. 2020). But we have recognized that the "weight of authority supports" concluding that a plaintiff can bring a disability-based harassment claim under the ADA—and thus under the Rehabilitation Act—because "every circuit to have [addressed this issue] has [so] concluded." *Id.*; *see also Ford v. Marion County Sheriff's Off.*, 942 F.3d 839, 851–52 (7th Cir. 2019) (collecting cases). Today we affirmatively decide this threshold question and join the weight of consensus in

holding that a disability-based harassment claim is available under the ADA and the Rehabilitation Act.

It is well established that a plaintiff may bring a hostile-work-environment claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq. See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). And as the Seventh Circuit succinctly stated, this same claim is available under the ADA because "Congress wrote the ADA using the language of Title VII." *Ford*, 942 F.3d at 852. The Fifth Circuit similarly reasoned that because the ADA and Title VII use almost identical language and "are also alike in their purposes and remedial structures," the ADA also "provides a cause of action for disability-based harassment." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 234 (5th Cir. 2001). Specifically, the Fifth Circuit concluded that "[i]t is evident, after a review of the ADA's language, purpose and remedial framework, that Congress's intent in enacting the ADA was . . . to eradicate disability-based harassment in the workplace." *Id.* at 233. And the Fifth Circuit observed that the Supreme Court construed Title VII, which has nearly identical language, "to provide a cause of action for 'harassment [which is] sufficiently severe or persuasive to alter the conditions of [the victim's] employment and create an abusive working environment . . . because it affects a term, condition, or privilege of employment.'" *Id.* (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989) (alterations in original); *see also* 42 U.S.C. § 12112(a). Thus, applying the Supreme Court's interpretation of Title VII, the Fifth Circuit "interpret[ed] the phrase 'terms, conditions, and privileges of employment,' as it is used in the ADA to 'strike at' harassment in the workplace." *Id.*

This reasoning is sound, and we now join our sister circuits that have held that hostile-work-environment claims are cognizable under the ADA. Additionally, we have held that "[t]he Rehabilitation Act is materially identical to and the model for the ADA," the difference being the application of the Rehabilitation Act is limited to federally funded programs. *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) (quoting *Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)). Thus, we also hold that hostile-work-environment claims are cognizable under the Rehabilitation Act.

**2.**

We now turn to whether Dr. Mattioda pleaded a plausible hostile-work-environment claim. For this claim, Dr. Mattioda must allege that he was subjected to harassment because of his disability, and that the harassing "conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th Cir. 2003) (citation omitted); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (stating that a complaint must provide "enough facts to state a claim to relief that is plausible on its face"). The district court concluded that Dr. Mattioda failed to state a plausible allegation that the harassing conduct occurred *because of* his disability. On appeal, Dr. Mattioda argues that the district court erred because he adequately pleaded causation and the district court should have applied the more liberal pleading standard articulated by *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), over the *Iqbal/Twombly* standard.

As an initial matter, we hold that the district court correctly applied the *Iqbal*/*Twombly* standard in assessing Dr. Mattioda's complaint. The Supreme Court decided *Swierkiewicz* before *Iqbal* and *Twombly*, holding that an employment-discrimination claim is not subject to a heightened pleading standard. 534 U.S. at 510–15. In *Twombly*, the Supreme Court explained that "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized that the . . . use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *Twombly*, 550 U.S. at 570 (alteration adopted) (citation omitted). To the extent that any differences remain between the pleading standards relied upon in *Swierkiewicz* and *Twombly*, in reconciling these decisions, we have explained that a complaint must contain sufficient factual allegations that plausibly suggest entitlement to relief. *Starr v. Baca*, 652 F.3d 1202, 1215–16 (9th Cir. 2011); *see also Austin v. Univ. of Oregon*, 925 F.3d 1133, 1136–38 (9th Cir. 2019) ("In *Swierkiewicz*, the Supreme Court reiterated that the prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."). The district court did not employ a heightened pleading standard as prohibited by *Swierkiewicz*, *see Austin*, 925 F.3d at 1136–38, nor did it err in applying the *Iqbal*/*Twombly* standard.

Applying the correct pleading standard, the district court concluded that Dr. Mattioda failed to allege a plausible causal nexus between the claimed harassment and his disabilities. This was error. On the record here, the district court's conclusion that Dr. Mattioda plausibly alleged disability-based discrimination, conflicts with its conclusion that he did not plausibly allege his disability was the basis for the harassment. For example, the district court

acknowledged that Dr. Dotson's threat to Dr. Mattioda's job was explicitly linked to his disabilities, but concluded that this allegation concerned only his disability claim based on "failure to accommodate," even though this allegation was "particularly" realleged as part of Dr. Mattioda's harassment claim. Such parsing of Dr. Mattioda's complaint is inconsistent with the district court's obligation to construe well-pleaded allegations in Dr. Mattioda's favor. *See Lathus*, 56 F.4th at 1240.

Further, the district court failed to acknowledge Dr. Mattioda's allegation that Dr. Lee's "series of harassing comments" began *after* Dr. Mattioda informed Dr. Lee of his disabilities.[6] *See Flowers*, 247 F.3d at 236–37 (concluding that evidence the employer's treatment of plaintiff changed after discovering her HIV-positive status supported a verdict for disability-based harassment). Construing this fact in Dr. Mattioda's favor and considering that Dr. Lee denigrated Dr. Mattioda as lazy and as using his disabilities to avoid work, Dr. Mattioda plausibly alleged a nexus between the described harassment and his disabilities. *See, e.g., Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008) (concluding that "the inference that racial animus motivated [a] nurse's requests that [plaintiff] perform the tasks of a maintenance man [wa]s a reasonable one that . . . must [be] construe[d] in his favor at the motion to dismiss stage"); *id.* (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004)) ("[A] coworker's use of a 'code word or phrase' can, under certain circumstances, contribute to a hostile work environment."). Dr. Mattioda's allegation that Dr. Dotson treated "non-disabled researchers" better,

---

[6] In fact, after learning of Dr. Mattioda's disability, Dr. Lee openly asked why Mattioda could not "tough it out."

further linked Dr. Dotson's allegedly harassing conduct to his disability. *See EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844–45 (9th Cir. 2005) (concluding discriminatory harassment claim should survive summary judgment where plaintiffs alleged supervisor treated female employees worse than males).

### 3.

Finally, although it is a close call, we are not persuaded by NASA's argument that Dr. Mattioda's hostile-work-environment claim fails on the alternative ground that Dr. Mattioda did not allege sufficiently severe or pervasive harassment.

To establish a hostile work environment, a plaintiff must show that the conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (citation omitted). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Nat'l Educ. Ass'n, Alaska*, F.3d at 847 (citation omitted). "'[A]ll the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'" inform whether an environment is sufficiently hostile. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) are not sufficient to create an actionable claim." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017) (internal quotation marks and citation omitted); *see also*

*Faragher*, 524 U.S. at 788 (explaining that harassment claims should not be based on "ordinary tribulations of the workplace" (citation omitted)). But it is enough if "hostile conduct pollute[d] the victim's workplace, making it more difficult for h[im] to do h[is] job, to take pride in h[is] work, and to desire to stay in h[is] position." *Reynaga*, 847 F.3d at 687 (citation omitted).

The conduct must be both subjectively and objectively abusive. *Craig*, 496 F.3d at 1055. Objective hostility is assessed by looking at the totality of the circumstances through the lens of a reasonable person with the same protected characteristic. *Id.* Supervisor harassment has "potentially greater impact" than coworker harassment. *Zetwick v. County of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017).

While some of our hostile-work-environment cases have involved relatively extreme conduct, *see, e.g.*, *Reynaga*, 847 F.3d at 687–88 (employee made "repeated" demeaning and "explicit racial and national origin comments in the workplace"); *Nichols v. Azteca Rest. Enters. Inc.*, 256 F.3d 864, 873 (9th Cir. 2001) (plaintiff testified that employees "habitually called him sexually derogatory names, referred to him with the [incorrect] gender, and taunted him for behaving like a woman"); *Ellison v. Brady*, 924 F.2d 872, 873–75, 880 (9th Cir. 1991) (plaintiff's male co-worker repeatedly asked her out and sent her disturbing love letters and "h[u]ng around her desk" and "pester[ed] her with unnecessary questions"), we have also recognized that less extreme conduct may be sufficient if it is repetitive.

For example, in *Davis v. Team Electric Company*, we held that it was a "close[] question" whether "an 'objective' reasonable woman" would find the harassment at issue severe or pervasive where "the incidents f[ell] far short of

physical abuse or aggressive sexual advances." 520 F.3d 1080, 1096 (9th Cir. 2008). The plaintiff was a female electrician and her supervisor agreed to transfer her, telling her another employee there needed "a girlfriend," and the supervisor repeatedly referred to his wife as "astrobitch." *Id.* at 1085. Her supervisors made it difficult for her to complete tasks, assigned her to hazardous assignments, and excluded her from meetings and breaks. *Id.* at 1085–87. Her supervisors also made some derogatory comments, including that "the donuts are for the guys," and "we don't mind if females are working as long as they don't complain." *Id.* at 1085 (alteration omitted). There, we concluded that in such close cases "where the severity of *frequent* abuse is questionable, it is more appropriate to leave the assessment to the fact-finder." *Id.* at 1096 (emphasis added).

In another case, we recognized that the conduct at issue—calling plaintiff "Manny" instead of "Mamdouh" over his repeated objections and belief that the nickname had racial implications—"may not have been especially severe," but was sufficiently pervasive because such incidents, which continued for almost a year, "were frequent and consistent rather than isolated." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073–74 (9th Cir. 2005*)*; *see also Zetwick*, 850 F.3d at 443–44 (concluding that where plaintiff's harasser hugged her more than 100 times over many years, a reasonable jury could consider cumulative effect and determine that hugging was sufficiently severe or pervasive to be actionable); *Ray v. Henderson*, 217 F.3d 1234, 1238, 1245 (9th Cir. 2000) (explaining that "[r]epeated derogatory or humiliating statements . . . can constitute a hostile work environment" and concluding plaintiff's claim should survive summary judgment where supervisors targeted him "for verbal abuse . . . for a period lasting over one and [a] half years," subjected

him to pranks, made a physically threatening gesture toward him, and falsely accused him of misconduct).

On the other hand, harassment is not sufficiently severe or pervasive to establish a hostile work environment where the conduct at issue consists of limited or isolated behavior. *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000). For example, in *Kortan*, after the plaintiff complained about her male supervisor using racist and sexist terminology on one occasion, he started "giving her looks instead of smiling" and told her that he made a mistake in assuming that she was Artemis because she was Medea. *Id.* at 1107–08. In affirming summary judgment in favor of the defendant, we considered the fact that, although offensive, the comments that the plaintiff complained about "were mainly made in a flurry on [one day]" and that this conduct was "concentrated on one occasion." *Id.* at 1110–11; *see also, e.g.*, *Vasquez v. County of L.A.*, 349 F.3d 634, 642–44 (9th Cir. 2003) (relying on *Kortan* to conclude that "[t]wo isolated offensive remarks," two incidents of yelling, and a couple of false complaints about plaintiff was not sufficiently severe or pervasive conduct for a hostile-work-environment claim).

Here, Dr. Mattioda has alleged sufficiently severe or pervasive harassment to survive NASA's motion to dismiss.**[7]** Similar to *El-Hakem*, *Ray*, and *Zetwick*, Dr. Mattioda alleges that Dr. Lee inhibited Dr. Mattioda's work opportunities and *repeatedly* made harassing and derogatory comments *over a period of years*, and he has described several specific examples. Dr. Mattioda further

---

[7] Most of our cases assessing whether sufficiently severe or pervasive harassment was present were resolved at summary judgment. *See, e.g.*, *Kortan*, 217 F.3d at 1108; *Vasquez*, 349 F.3d at 639.

alleges, among other conduct, that Dr. Dotson vaguely threatened his job, demeaned him by making him sign a letter acknowledging Dr. Dotson's refusal to reconsider Dr. Mattioda's poor performance rating, and made insulting comments about his reasonable-accommodation requests and job performance. While neither the severity nor the frequency of the alleged offensive conduct alone indicates that the hostile-work-environment standard obviously is satisfied, *see, e.g.*, *Kortan*, 217 F.3d at 1110–11, Dr. Mattioda's allegations do indicate that the "severity of frequent abuse is questionable" such that "it is more appropriate to leave the assessment to the fact-finder." *Davis*, 520 F.3d at 1096.

For these reasons, we conclude that Dr. Mattioda plausibly alleged a hostile-work-environment claim based on his disability.

## B. Disability-Discrimination Claim

We review a district court's grant of summary judgment de novo "to determine whether, viewing all evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

As previously stated, the parties agree that the district court correctly used the *McDonnell Douglas* burden-shifting framework in assessing Dr. Mattioda's claim. *Mustafa v. Clark County. Sch. Dist.*, 157 F.3d 1169, 1174–76 (9th Cir. 1998) (applying *McDonnell Douglas* framework to plaintiff's Rehabilitation Act discrimination claim). Under this framework, a plaintiff must make a prima facie case establishing that (1) he is a person with a disability; (2) otherwise qualified for employment; and (3) suffered

discrimination because of his disability. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Where a plaintiff establishes such a prima facie case, the burden shifts to the employer to provide a non-discriminatory reason for the adverse action. *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005). If the employer meets that burden, then the employee must show that the employer's reason is pretextual. *Id.* Even if a biased employee was not the final decisionmaker, a plaintiff may rely on a "cat's paw" theory to establish a causal link by proving that the biased non-decision-making employee "influenced or was involved in the decision or decisionmaking process." *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015) (internal quotation marks and citation omitted).

Dr. Mattioda argues that Dr. Lee influenced the selection panel to prevent Dr. Mattioda's selection.[8] Dr. Mattioda's reliance on the cat's-paw theory is dubious where the only supporting evidence is his own speculative declaration and evidence that Dr. Lee was initially appointed to the selection panel and shared the candidates' h-indices before recusing himself. The record is devoid of evidence that the panel "deferred to" Dr. Lee or that the h-index values Dr. Lee provided were a determinative factor in the panel's decision, particularly where Dr. Mattioda concedes that he is less experienced than Dr. Sandford and that the two other

---

[8] Dr. Mattioda also argues in passing that NASA failed "to take 'affirmative action'" or give him a preference for the ST Position based on his disability status. But he points to no authority that the failure to give him a preference supports a discrimination claim and, therefore, the argument is waived. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.").

candidates self-reported their h-indices.[9] *Cf. France*, 795 F.3d at 1176 (reversing summary judgment where biased employee formally recommended the candidates and the other interviewers deferred to his recommendation); *Shager v. Upjohn Co.*, 913 F.2d 398, 399–400, 405 (7th Cir. 1990) (concluding there was evidence a biased supervisor tainted the committee's firing decision where supervisor recommended termination and exaggerated the employee's deficiencies, and committee's deliberations were "brief" or "perfunctory" and deferential).

But even assuming, as the district court did, that Dr. Mattioda established a prima facie case of disability discrimination, he repeatedly conceded that NASA's non-discriminatory reason for not selecting him for the position—that Dr. Sandford was more qualified for the selective position—is valid. Further, there is no evidence that the "technical excellence" criteria that the selection panel considered, including a candidate's mission experience and publication impact, were invented to discriminate against Dr. Mattioda based on his disability. "Technical excellence" was one of the five criteria listed on NASA's evaluation form for the ST Position. And although Dr. Mattioda contends that the form makes no mention of the h-index or "deep space" mission experience, the form referenced experience and publications as considerations, the job posting referenced "space science missions," and other NASA panels have considered the "h-index as a criteria for selecting a scientist."

---

[9] Dr. Mattioda contends that Dr. Howell was a "panelist who was clearly influenced by Dr. Lee's data." But Dr. Howell was not ultimately on the panel that selected the candidate for the ST Position.

Where NASA proffered a legitimate nondiscriminatory reason for selecting Dr. Sandford for the ST Position, and Dr. Mattioda concedes that Dr. Sandford has more relevant experience, the district court did not err in granting summary judgment on this claim. *See Opara v. Yellen,* 57 F.4th 709, 725–27 (9th Cir. 2023) (explaining that employer's burden under *McDonnell Douglas* is one of production, not persuasion, and affirming summary judgment in favor of employer based on employee's failure to raise a genuine dispute as to the employer's motive); *see also Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746–48 (9th Cir. 2011) (same).

Relying primarily on *Bergene v. Salt River Project Agricultural Improvement & Power District*, 272 F.3d 1136 (9th Cir. 2001), Dr. Mattioda argues that there is sufficient evidence to create a genuine issue of material fact as to pretext. But *Bergene* is inapposite. In that case, where a plaintiff alleged that she was denied a promotion in retaliation for bringing a Title VII claim, there was "evidence of a direct threat [from her former supervisor] of adverse employment consequences if [she] vigorously pursued her earlier Title VII claim." *Id.* at 1142. The plaintiff in *Bergene* also produced circumstantial evidence supporting that the employer's justification for denying her promotion was pretextual, including that her immediate supervisor—who was responsible for selecting the candidate for promotion—called her "trouble" and said that he had "heard about [her]," and that the job promotion was awarded to another candidate who was qualified only because the plaintiff's supervisor changed the job requirements to "remove [the plaintiff's] competitive advantage." *Id.* There is no similar direct or circumstantial evidence here. Moreover, unlike in *Bergen*, where the comments were made

by either the decisionmaker or someone that could influence the decision, Dr. Lee's prior comments to and treatment of Dr. Mattioda are irrelevant to the pretextual analysis because the selection panel made an independent assessment and selection.

Accordingly, we affirm the district court's summary judgment in NASA's favor on Dr. Mattioda's disability-discrimination claim based on his non-selection for the ST Position.

**AFFIRMED in part; REVERSED in part; REMANDED for further proceedings consistent with this opinion.[10]**

---

[10] Each party shall bear its own costs. Fed. R. App. P. 39(a)(4).